UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Richard Simone, Jr.,
    Plaintiff

v.                                    Case No. 20-cv-336-SM
                                      Opinion No. 2022 DNH 005

Andrew Monaco, et al.,
    Defendants


# O R D E R

After leading law enforcement officers on a lengthy, multi-state, motor-vehicle pursuit, Richard Simone, Jr., eventually surrendered to police in Nashua, New Hampshire.  Officers from the Nashua police department, as well as officers from Holden, Massachusetts, and State Troopers from Massachusetts and New Hampshire, all participated in the pursuit and were present for Simone's "felony stop" arrest.  In this case, Simone seeks compensation for injuries sustained as a result of physical force used against him by two of those officers – force that Simone claims was excessive and, therefore, employed in violation of his Fourth Amendment rights.


Simone originally named sixteen defendants, including many of the officers who were involved in the pursuit and/or present

for his arrest, as well as the State of New Hampshire, the Commonwealth of Massachusetts, the City of Nashua, and the Town of Holden.  Many have since been dismissed or have settled with Simone.  Of the remaining defendants, four move for summary judgment: New Hampshire State Police Sergeant Mark Suttmeier; Lieutenant Clark Gaphardt and Officer Steven Hallam of the Nashua Police Department; and James Tollner, in his official capacity as Chairman of the Nashua Police Commission.  For the reasons discussed, those motions are granted.[1]

### Standard of Review

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of

---

[1]     When the events at issue unfolded, Sergeant Suttmeier held the rank of Trooper and Lieutenant Gaphardt held the rank of Sergeant.

either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted). If a genuine dispute of material facts exists, such a dispute must "be resolved by a trier of fact," not by the court on summary judgment. Kelley v. LaForce, 288 F.3d 1, 9 (1st Cir. 2002).

When objecting to a motion for summary judgment, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." Perez v. Lorraine Enters., 769 F.3d 23, 29-30 (1st Cir. 2014). In other words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment." Tobin v. Fed. Express Corp., 775 F.3d 448, 451-52 (1st Cir. 2014). See generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

**Background**

Richard Simone, Jr., has a lengthy criminal history that includes convictions for weapons charges, drug possession, and

drug distribution, as well as multiple arrests for assault and battery, many of which arose out of bar fights and street fights.  Simone Deposition (document no. 161-2) at 33-35.  He was incarcerated for two years on a drug possession/distribution conviction, 18 months for a firearm conviction, and 54 months for armed assault with a firearm.  Id. at 36-37; 106-07.  He also received a two-year suspended sentence for what appears to have been a fraud charge arising out of the sale of an automobile.  Id. 112; 157-58.

On May 8, 2016, three days before the events at issue, a police officer in Millbury, Massachusetts, attempted to stop Simone for a probation violation.  Simone saw the patrol car's flashing lights but, rather than pulling over, he kept driving.  He testified that he was aware that there was an outstanding warrant for his arrest and did not want to go back to jail.  Id. at 41; 115.  The initiating officer was eventually joined by another who positioned his cruiser in front of Simone and attempted to block Simone's path.  Simone swerved to avoid the police cruiser and led the officers on a brief chase.  He was eventually able to evade the officers and avoid arrest.  Id. at 41-46.

According to Simone, before the so-called "Millbury pursuit," he had fled from police who were actively trying to stop him on four or five other occasions.  Id. at 54.  Another such occasion gave rise to the events at issue here.

I.    The May 11 Pursuit.

Three days after the Millbury pursuit, on May 11, Simone was driving through Holden, Massachusetts.  An officer spotted Simone and activated his cruiser's flashing lights in an attempt to pull him over.  Id. at 47.  Simone refused to stop because, again, he knew there was a warrant out for his arrest and he didn't want to go back to jail.  Id. at 48.  Additional officers joined the pursuit at various points and attempted to slow or stop Simone's vehicle.  Id. at 51.  Simone led the officers on a chase through the towns of Holden, West Boylston, Clinton, Lancaster, and Tyngsborough, Massachusetts, before eventually entering New Hampshire.  Simone estimates that, at times, he reached speeds of 85 miles per hour.  Id. at 58.

The evidentiary record contains an audio recording of the New Hampshire State Police dispatcher's conversations with some of the pursuing officers, as well as a transcript of that recording.  See Audio Recording of N.H. State Police Radio Transmissions (document no. 161-6, conventionally filed);

Transcript of N.H. State Police Dispatch Calls (document no. 161-7).  The audio recording begins at 4:49 PM.  At that point, Simone was on the Everett Turnpike in Tyngsborough, Massachusetts.  The dispatcher informed the pursuing officers that the suspect, Simone, was "wanted for numerous warrants out of Holden" and reported that he was traveling at "speeds of 90 MPH at this time."

At approximately 4:56 PM, Simone crossed into Hudson, New Hampshire.  The dispatcher notified officers of the same and reported that tire spikes were being deployed.  About three minutes later, the dispatcher informed pursuing officers that, the "subject does have felony warrants out of Mass; unknown what they're for."  After repeated inquiries from pursuing officers about the nature of Simone's warrants, at 5:03 PM the dispatcher informed them that, "subject has a long history of pursuits; very violent."

As Simone raced through Hudson, an officer with the Hudson police department attempted to stop him by hitting the rear of Simone's pickup truck with the officer's police cruiser.  That impact caused Simone to briefly lose control of his vehicle, spin, and collide with a telephone pole.  Officers were informed by the dispatcher that the suspect had "crashed at Hudson town

6

hall."  But, twenty seconds later, the dispatcher told officers
that the suspect was "still moving," after Simone was able to
get his truck back on the road and resume his efforts to evade
the police.  At 5:07 PM, the dispatcher informed pursuing
officers that Simone's vehicle had "multiple flat tires."
Simone then crossed the Merrimack River and drove into Nashua,
New Hampshire.  As Simone approached Main Street in Nashua, the
dispatcher reported that he was traveling at "speeds at 60."

II.  <u>The Arrest</u>.

The events related to Simone's arrest are documented in a
video taken from a news helicopter flying overhead.  <u>See</u> Video
of Arrest (document no. 161-5, filed conventionally).  As the
video begins, Simone can be seen driving a silver Chevrolet
pickup truck through Nashua.  The left rear and right front
tires are shredded, debris is flying onto the road, and the
vehicle is riding on the tire rims.  <u>See</u> <u>Id</u>. at 00 minutes, 58
seconds.  A New Hampshire State Police cruiser is directly
behind Simone and attempts (unsuccessfully) to get in front of
him in an effort to slow him down.  <u>Id</u>. at 01:20.  Simone

accelerates and swerves toward the cruiser, collides with it, and speeds ahead.  Id. at 01:26.[2]

At the 02:45 mark on the video, Simone turns left onto Brigham Street, a dead-end road in Nashua.  The video does not bear a time stamp, so it is difficult to precisely link it with the audio recording and transcript of the state police dispatcher's report.  But, at 5:12 PM, the dispatcher notified officers that Simone had driven onto a dead-end street and was stopping his vehicle.  Twenty four seconds later, Sergeant Suttmeier radioed the dispatcher and informed her that officers had "one in custody."

The moments between the time Simone stopped his vehicle and the time at which he was taken into custody were tense, fast-moving, loud, and chaotic.  Numerous police officers were at the scene, rushing toward Simone, drawing their service weapons, and yelling.  Some police cruisers still had their lights on and sirens blaring.  A police K9 unit was present, the dog was barking, and more than one officer was shouting "We have a canine.  We have a canine."  And at least two news helicopters

---

[2]    It appears that the cruiser Simone hit was being driven by defendant New Hampshire State Police Trooper Andrew Monaco.  See Deposition of Mark Suttmeier (document no. 161-3) at 22, 27.

were orbiting overhead.  See, e.g., Simone Deposition at 68-69;

Affidavit of Clark Gaphardt (document no. 158-6) at para. 12;

Deposition of Clark Gaphardt (document no. 170-6) at 17-26.


   As they approached Simone's vehicle, Sergeant Suttmeier and

other officers knew or were told that: (1) Simone had a "long

history" of police pursuits; (2) he had evaded police from

several jurisdictions for an hour or more, often at high speed;

(3) he refused to surrender after he lost control of his truck

in Hudson and crashed into a telephone pole; (4) he seemed

determined to avoid arrest, having continued to evade police

even after two of the tires on his truck had been shredded and

he was driving on the rims; (5) he was wanted on "numerous

felony warrants"; and (6) he was "very violent."


   Sergeant Suttmeier testified about his mindset in the

moments leading up to his confrontation with Simone, saying:

> There were three options that were running through my
> head based upon the length of the pursuit, what was
> radioed over dispatch, as far as his past, what the
> pursuit was for, you know, dangerous violent felonies,
> weapons charges.  And that was coming from Holden.
>
> I was anticipating that, for someone running that
> long, he was going to present a deadly force
> situation, shoot himself in front of me, or take [off]
> -- continue running and turn [this] into a hostage
> situation.

* * *

    As the information is coming over the radio, I'm
    preparing myself mentally for what I may be faced
    with and have to deal with.

Suttmeier Deposition at 17.


At the 03:12 mark on the video, Simone's truck can be seen, stopped near the end of the road, with several police cruisers approximately 35-45 feet behind him.  Four officers are visible, out of their cruisers, with weapons drawn.  Shortly thereafter, others can be seen running forward, toward Simone's truck. Sergeant Suttmeier shouted to the other officers that he would "call" the felony stop – that is, Suttmeier would assume responsibility for instructing Simone and getting him out of the vehicle safely.  At the 03:18 mark on the video, Simone's left hand can be seen extending out the driver's window; his right hand is not visible.  Suttmeier described Simone as "being cocky," failing to follow some instructions, and taking things at his own (slow) pace.  See Suttmeier Deposition at 38-39. Other officers concurred.  See, e.g., Deposition of Steven Hallam (document no. 170-3) at 22, 24-25 ("I would say he was passively resisting.  He wasn't following orders."); Affidavit of Clark Gephardt (document no. 158-6) at para 14 ("The driver did not completely comply with the instructions.  Although

Sergeant Suttmeier instructed him to stick his hands out the window, Plaintiff instead opened the door from inside the truck, during which time both hands could not both be seen.  Once he exited the truck, Plaintiff got to his knees but did not put his hands up, instead keeping them by his side even though officers were instructing him to 'put [his] hands up.'  He then got on his hands and knees but failed to directly move to lay on his stomach as directed.").  Although Simone was not presenting any overt signs of resistance, he had not been "cleared" and officers had no way to know whether he had any weapons or if he truly intended to surrender.

As Simone opens the driver's door to his truck, Sergeant Suttmeier can be seen approximately ten feet away, with his weapon drawn.  Id. at 03:25.  Suttmeier moves to his left, taking cover behind a telephone pole, as he instructs Simone to get on the ground.  Id. at 03:29.  Seven other police officers are visible, standing near the rear of Simone's vehicle.  Among them are the Nashua police defendants, Gaphardt and Hallam.

As Sergeant Suttmeier instructs Simone to move from his knees to a prone position, the surrounding officers begin to move closer.  Id. at 03:32.  Two officers – New Hampshire State Police Trooper Andrew Monaco and Massachusetts State Trooper

Joseph Flynn quickly move to the front of that group and rush to

Simone.  At the 03:33 mark on the video, Monaco punches Simone

on the side of his head.  Flynn follows suit and both appear to

land several punches to Simone's head and torso.  Sergeant

Suttmeier is standing about six feet to the left.  He testified

that, at that moment he believed the other officers must have

seen Simone do something threatening, prompting Monaco and Flynn

to react:

> I remember seeing a fist come out from the
> periphery.  So right now, to put it into context, I
> can't hear anything, and I have tunnel vision, because
> I'm fully prepared for a deadly force encounter, him
> committing suicide or trying to continue fleeing,
> because I'm thinking there's no way this is going to
> end right now after an hour and some-odd long pursuit
> where there were cruisers rammed and accidents and
> spikes, and he just kept going to this dead-end
> street.  So I'm in an extremely heightened state of
> alertness and awareness, and I have tunnel vision.  So
> at some point in time, I see a fist come out of the
> peripheral.
>
> * * *
>
> As I'm seeing the fist come in, all I see is
> the arm and a fist.  That snapped my tunnel vision,
> and I look up and see Andy Monaco.  And then I see a
> pile of people get onto this guy, and I'm pointing my
> gun at all of these people.  At that point in time,
> I'm like, "Holy shit, what I did miss?"

Deposition of Mark Suttmeier (document no. 161-3) at 56, 64.

See also Id. at 71-72 ("I don't know what they were seeing.  I

still don't know to this day what I missed.  There's so much to

this I don't know.  I can't tell you what they're seeing. . . .
I still don't know to this day.  He was far from secure, and the
scene was far from safe.  We had not cleared his - we had no
idea what was in his waistband or behind him.  We had no idea.
This is where the majority of the resistance starts to take
place.").

Surely adding to his belief that Simone must have done
something threatening to provoke Monaco was the fact that
Sergeant Suttmeier had worked with Monaco for about four years
and saw him as someone who is "laid back."  Suttmeier Deposition
at 14.  He described Monaco "as easygoing as they get.  Squared
away.  A good person."  Id. 21.  To Suttmeier's knowledge,
Monaco had never been accused of using excessive force.  Id. at
14.

A few seconds after Monaco and Flynn first strike Simone,
Officers Gaphardt and Hallam of the Nashua Police Department
move in to assist them in taking Simone into custody.  Officer
Hallam testified that:

> Various officers – including Lt. Gaphardt and I –
> began to close the distance to Plaintiff.
>
> Based on my experience and training, I had
> considerable concerns that the driver would not
> surrender peacefully given the length of the pursuit,
> the evasive actions taken by him to this point, and

his non-compliance with the instructions he was being
given.

I could not see the driver's hands from my vantage
point even when he was out of his vehicle.

As we approached, two troopers began to run towards
the driver.  I did not know either of them but <u>assumed
they must have seen some threat</u>.  I saw one Trooper
appear to knock the driver to the ground.

Recognizing that any arrestee remains a risk until the
arrest is complete and he is in handcuffs, <u>and not
knowing what may have prompted the Troopers' actions</u>,
I moved forward to assist with the arrest.

Affidavit of Steven Hallam (document no. 158-7) at paras. 7-12

(emphasis supplied).  Lieutenant Gaphardt testified similarly

and added:

Although I saw Trooper Monaco strike Plaintiff on the
left side of his head when he (the trooper) first
reached Plaintiff, I was ten to twelve feet away at
the time and could not at the time ascertain why the
trooper had done so.  <u>I did not conclude that the use
of force was excessive at that time because I did not
know what the trooper may have been perceiving at the
time</u>.  I did not see any further use of force by
either trooper as I was then focused solely on
securing Plaintiff in handcuffs.

Affidavit of Lieutenant Clark Gaphardt (document no. 158-6) at

paras. 21 (emphasis supplied).

Once he reaches Simone, Gaphardt moves to Simone's left

side in an effort to secure his left hand, so he could be

handcuffed.  Meanwhile, Hallam places his weight on, and
attempts to secure, Simone's left hip so he cannot get up.


At 03:42 – nine seconds after Monaco threw the first punch
at Simone, Sergeant Suttmeier steps forward and shouts "Easy!
Easy!"  Monaco and Flynn respond by looking up at Suttmeier and
both men stop hitting Simone.  Indeed, Monaco had drawn his
right arm back to strike Simone again, but he stopped as soon as
Suttmeier grabbed his attention.  Id. at 03:43.  Sergeant
Suttmeier testified that, at that point, he believed Officers
Hallam and Gaphardt had secured Simone, so he turned away and
began walking back toward his cruiser to notify dispatch, scan
for any other threats, and begin breathing exercises he had been
taught in order to decompress from stressful situations like
this one.  See, e.g., Suttmeier Deposition at 78 ("So there was
a point in time where I walk up and I see arms getting pulled
out from behind, and I yell, 'Easy. Easy' to break their task
fixation, because they're fixated on their task of taking him
into custody, that we have the arms, 'Easy, easy.'  And then I
walk to my cruiser to let dispatch know that we have one in
custody.").


That period of comparative calm prompted by Sergeant
Suttmeier's intervention lasts for five seconds.  But, as soon

as Suttmeier turns away, see id. at 03:47, Monaco and Flynn
begin punching (or attempting to punch) Simone for a second
time.  Monaco also strikes Simone with his knee.  Id. at 03:51.
The second round of blows to Simone goes on for an additional
five seconds and ends at the 03:52 mark on the video.  At that
point, Nashua Officers Gaphardt and Hallam have fully secured
Simone in handcuffs and the several officers around Simone
noticeably relax.  Lieutenant Gaphardt assists Simone to his
feet and escorts him back to a Nashua police cruiser.

The claims currently at issue arise out of that chaotic
roughly 19 or 20-second period of time – consisting of the
initial period of nine seconds during which Monaco and Flynn
struck Simone, the approximately five-second reprieve caused by
Sergeant Suttmeier's intervention, followed by the second period
of five seconds during which Monaco and Flynn punched and kneed
Simone again.

Monaco and Flynn were subsequently indicted on assault
charges related to their conduct on that day.  Flynn pled
guilty, while Monaco was acquitted by a New Hampshire jury.
But, beyond whatever civil liability Flynn and Monaco may have
for their conduct, Simone says Sergeant Suttmeier, Lieutenant
Gaphardt, and Officer Hallam are also liable to him for having

failed to intervene on his behalf to stop Flynn and Monaco from
employing excessive force.  Simone also claims that Gaphardt and
Hallam are themselves liable for having employed excessive
force.  And, finally, Simone says James Tollner is liable, in
his official capacity as Nashua Police Commissioner, for having
failed to adequately train Nashua police officers in the proper
execution of a felony stop and arrest.

## Discussion

I.   <u>Excessive Force</u>.

In count two of his amended complaint, Simone alleges that
Lieutenant Gaphardt and Officer Hallam employed excessive force
while attempting to secure him in handcuffs – that is, by
"physically restrain[ing] Mr. Simone during his arrest and while
he was being assaulted by Trooper Monaco and Trooper Flynn."
Amended Complaint at para. 134.

Claims of excessive force in the context of an arrest are
analyzed under the Fourth Amendment, which guarantees citizens
the right "to be secure in their persons . . . against
unreasonable . . seizures."  U.S. Const. amend. IV.
Consequently, to prevail on his excessive force claim, Simone
must demonstrate that Lieutenant Gaphardt and/or Officer Hallam
employed a level of force against him that was not objectively

reasonable when viewed in light of the facts and circumstances facing them at the time, without regard to their subjective intent or motivation.  See, e.g., Graham v. Connor, 490 U.S. 386, 396-97 (1989); Alexis v. McDonald's Restaurants of Massachusetts, Inc., 67 F.3d 341, 352 (1st Cir. 1995).

While the term 'reasonable' is a familiar one, often used in the context of common law negligence claims, the court of appeals for this circuit has noted that it has a more "generous" meaning in the context of at least some Fourth Amendment claims.

> [T]he Supreme Court's standard of reasonableness is
> comparatively generous to the police in cases where
> potential danger, emergency conditions or other
> exigent circumstances are present.  In Graham v.
> Connor, the Court said that the "calculus of
> reasonableness" must make "allowance" for the need of
> police officers "to make split-second judgments - in
> circumstances that are tense, uncertain, and rapidly
> evolving - about the amount of force that is necessary
> in a particular situation."

Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994) (quoting Graham, 490 U.S. at 394).  The court of appeals concluded that, "the Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases."  Id.  See also Graham, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to

make an arrest or investigatory stop necessarily carries with it
the right to use some degree of physical coercion or threat
thereof to effect it. . . . The 'reasonableness' of a particular
use of force must be judged from the perspective of a reasonable
officer on the scene, rather than with the 20/20 vision of
hindsight. . . . Not every push or shove, even if it may later
seem unnecessary in the peace of a judge's chambers, violates
the Fourth Amendment.") (citation and internal quotation marks
omitted).

In determining whether an officer's conduct was
"objectively reasonable" under the circumstances, the court (or
trier of fact, as the case may be) must consider, among other
things, the following factors: "the severity of the crime at
issue, whether the suspect poses an immediate threat to the
safety of the officers or others, and whether he is actively
resisting arrest or attempting to evade arrest by flight."
Graham, 490 U.S. at 396.  See also Alexis, 67 F.3d at 352-53.

Here, in support of his excessive force claim against
Lieutenant Gaphardt, Simone argues:

> Gaphardt effectively ignored the fact that he just
> witnessed Monaco strike Simone without any reasonable
> justification and immediately knelt to the ground to
> try and gain control of Simone's left arm to place him

19

in handcuffs.  Gaphardt testified during his
deposition that "I had it in my mind that I was going
to be the person to cuff him, and that was my mission,
and that's what I was focused on."  While Simone was
being repeatedly struck by Monaco and Flynn, Gaphardt
had physical contact with Simone's left arm and was
looking in Simone's general direction.  Despite the
video footage showing Monaco and Flynn repeatedly
striking Simone while Gaphardt is facing Simone and
physically restraining him, Gaphardt asserted that,
with the exception of the first punch thrown by
Monaco, Gaphardt did not feel or perceive Monaco or
Flynn strike Simone.  Gaphardt admits that had he "had
the presence of mind to see what he [i.e., Monaco] was
doing as I was doing what I was doing, I certainly
would have verbally intervened and told him, 'Hey,
that's not necessary.  We don't need to be doing that
right now.  Stop what you're doing."

Plaintiff's Memorandum (document no. 170-1) at 6 (citations

omitted) (emphasis supplied).  Simone's excessive force claim

against Officer Hallam shares a similar foundation:

From the time Simone exited his vehicle to the time
Simone was knocked to the ground by a police officer,
Hallam did not observe or perceive any behavior from
Simone justifying the use of physical force in
knocking Simone to the ground.  From the time Simone
exited his vehicle to the time Simone was placed in
handcuffs, Hallam did not observe any behavior from
Simone indicating he posed a threat or was resisting
arrest.  Hallam perceived that the use of force
knocking Simone to the ground was unlawful.  Upon
observing Simone being knocked to the ground by
unlawful force, Hallam's immediate reaction was to
physically restrain Simone and keep him on the ground.

Plaintiff's Memorandum (document no. 170-1) at 8 (citations

omitted) (emphasis supplied).  Simone does not allege that

either officer personally employed excessive force.  Rather, he

claims they knowingly and intentionally facilitated the unlawful conduct of Flynn and Monaco by restraining him while those other officers struck him.  <u>See generally</u> <u>Martinez v. Colon</u>, 54 F.3d 980, 985 n.4 (1st Cir. 1995) ("A constitutional duty to intervene may also arise if onlooker officers are instrumental in assisting the actual attacker to place the victim in a vulnerable position.  In such a scenario, the onlooker officers and the aggressor officer are essentially joint tortfeasors and, therefore, may incur shared constitutional responsibility.") (citations omitted).

But, both Officer Hallam and Lieutenant Gaphardt testified that, at the moment Flynn and Monaco began striking Simone, neither knew what those officers had seen or perceived that might have prompted their forceful response.  Nothing in the record contradicts (or even undermines) that testimony.  So, Simone's characterization of their conduct as having knowingly condoned, or even assisted, the use of "unlawful force" is unsupported by any evidence in the record.  So too is his suggestion that Hallam immediately perceived the force used by Monaco and/or Flynn to be "unlawful."  No evidence in the record supports that claim.  Hallam made clear that <u>only in retrospect</u> – after becoming more familiar with exactly what happened around

him on that afternoon – did he conclude that Monaco and Flynn
acted "unlawfully."

Notwithstanding Simone's suggestion to the contrary, the
level of force employed against Simone was not per se
unreasonable.  Under some circumstances, the force employed by
Flynn and Monaco could have been reasonable.  For example,
observation of an accessible weapon, or Simone's movement to
grab an available weapon, might well suffice.  Consequently, the
defendant police officers cannot be charged with immediately
recognizing that Simone's constitutional rights were being
violated once Flynn and Monaco began striking him.  Context is
critical.  So, too, is the fact that these events unfolded
quickly, under stressful and potentially dangerous conditions.
According to both Officer Hallam and Lieutenant Gaphardt, in the
brief but chaotic moments surrounding Simone's arrest, from
their limited vantage points, they had no idea if the level of
force being employed by Flynn and/or Monaco was reasonable and
in response to a real or perceived threat on Simone's part.
See, e.g., Hallam Deposition at 34 ("Not from my perspective.  I
had to believe the officer was acting in good faith, and he saw
something that I didn't see.  I wasn't able to locate Mr.
Simone's hands, so I have no idea what his hands were doing at
that time.  That was what I was trying to do, so I don't know if

the individual who did punch him was witnessing something else
at that moment."); Id. at 39 (Question: And why didn't you do
anything, or why didn't you attempt to stop Mr. Simone from
being punched?"  Answer: "At that point, I have to believe that
these officers were acting in good faith, that they see
something at that moment that I don't.  And my primary purpose
at that time was to place him in handcuffs.  And what I did
witness occurred quick, so there was no opportunity.  Even if I
did -- you know, was able to, I wouldn't be able to stop it to
begin with.); Id. at 54 (testifying that he didn't stop trying
to handcuff Simone or attempt to identify the officer who was
hitting Simone because he was focused on finding Simone's hands
and "I didn't believe it to be illegal force at the time  . . .
in the moment, I didn't believe it to be excessive force."); Id.
at 63 ("Based on the information I had at the time in the
circumstances – obviously hindsight is different, but, in that
moment, I didn't believe they did anything wrong at the
moment."); Id. at 64 ("Obviously, if I knew that at the time
[i.e., that excessive force was being employed], I would have
intervened.").

    Having no reason to believe otherwise - and there is no
evidence in the record suggesting that they should have believed
otherwise - Lieutenant Gaphardt and Officer Hallam trusted that

Flynn and Monaco were responding appropriately and acting
lawfully.  If they did not know (and cannot reasonably be
charged with knowing) that Monaco and Flynn were applying
unnecessary force, they could not have knowingly condoned or
facilitated it.  Moreover, given the brief time period involved,
that application of force was completed before the officers
could have effectively intervened to stop it.  Nevertheless,
Simone argues that the factual record is such that a jury must
decide whether the evidence supports his excessive force claims
against Officers Hallam and Gaphardt.

> Mr. Simone alleges that the Nashua Defendants were
> instrumental in aiding his injuries because they held
> him down and restrained him while Monaco and Flynn
> viciously beat him.
>
> * * *
>
> [I]t is for the jury to decide whether joint liability
> attaches as it is a fact-specific determination and
> necessarily involves credibility determinations.  More
> particularly, it is for the jury to decide whether to
> believe the Nashua Defendants' version of events –
> namely, that they did not observe (and willfully
> ignored) the majority of beating administered by
> Monaco and Flynn against Simone – or whether they
> believe that the Nashua Defendants' actions in
> deliberately pinning Simone to the ground while Monaco
> and Flynn pounded away is indicative of a joint
> venture.

Plaintiff's Memorandum at 10 (emphasis supplied).  The court
disagrees.

For Simone to survive summary judgment, he cannot rely exclusively on surmise, conjecture, and speculation and then declare that there are genuinely disputed material facts that must be resolved by the jury.  Rather, he must point to some evidence in the record to support his theory of the case and upon which the jury might reasonably rely – even if only inferentially - in concluding that Officers Hallam and Gaphardt were engaged in a "joint venture" with Monaco and Flynn to employ excessive force against Simone.  He has, however, pointed to none.  See generally Wilson v. Town of Mendon, 294 F.3d 1, 15 (1st Cir. 2002) ("While there is no requirement that a plaintiff seeking to establish joint venture liability prove the existence of an anticipatory compact, aiding and abetting liability does require proof that a defendant associated himself with the venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed.").

On this evidentiary record, a properly instructed jury would necessarily be required to conclude that the conduct of Officer Hallam and Lieutenant Gaphardt was, under the chaotic circumstances presented and in light of the limited information they possessed, objectively reasonable.  Simone's excessive force claim against those officers could only survive based on

speculation and unsupported inference.  That is plainly insufficient.

II.  <u>Common Law Battery</u>.

In count three of his amended complaint, Simone alleges that Lieutenant Gaphardt and Officer Hallam are liable to him for common law battery.  In his memorandum of law, Simone makes only a single reference to his battery claim, implying that he either recognizes its weakness or has abandoned it entirely.  In that sole reference, Simone says:

> Gaphardt and Hallam violated Simone's clearly established constitutional rights by using excessive force when restraining Simone on the ground while two polices officers punched and kneed the defenseless Simone over 20 times.  This contact also amounts to a battery.

Plaintiff's Memorandum at 2.  To the extent Simone's battery claim depends on his assertion that Hallam and Gaphardt were "joint venturers" with, or knowingly facilitated, Monaco and Flynn in using unprivileged and excessive force against him, that claim fails for the reasons stated above.  The conduct of those officers was, under the circumstances, objectively reasonable.

To the extent Simone might possibly be articulating a battery claim based upon those officers' actual conduct in handcuffing Simone, such a claim would also fail as a matter of law.  As this court (Barbadoro, J.) has noted, police officers are permitted to use that amount of force reasonably necessary to take a suspect into custody.

> [Plaintiff] alleges that the officers' conduct in arresting him constitutes assault and battery.  In New Hampshire, justification is a complete defense to any civil action, and "[a] law enforcement officer is justified in using non-deadly force upon another person when and to the extent that he reasonably believes it necessary to effect an arrest or detention[.]"  N.H. Rev. Stat. Ann. § 627:1; N.H. Rev. Stat. Ann. § 627:5.  Under this statute, reasonableness is determined by an objective standard.

Dionne v. Amatucci, No. 10-CV-230-PB, 2011 WL 4915550, at *6, 2011 DNH 170 (D.N.H. Oct. 17, 2011) (citing State v. Cunningham, 159 N.H. 103, 107 (2009)).  See also Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010) ("Where a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, our determination of the reasonableness of the force used under § 1983 controls our determination of the reasonableness of the force used under the common law assault and battery claims.").

So it is in this case.  Officer Hallam and Lieutenant
Gaphardt were legally authorized to use reasonable, but not
excessive, force in attempting to control Simone's hands,
handcuff him, and take him into custody.  They complied with
that legal mandate.  Indeed, Simone does not complain about the
level of force Hallam and Gaphardt employed to secure his arms
and hands, or the force used to place him in handcuffs (nor does
he complain of any injuries resulting from those lawful
efforts).  Under the circumstances, and given the evidentiary
record, the conduct of Officer Hallam and Lieutenant Gaphardt
was, as a matter of law, objectively reasonable.  Consequently,
it cannot form the basis of a viable claim for battery.


III. <u>Failure to Intervene</u>.

In count four of his amended complaint, Simone alleges that
Sergeant Suttmeier, Lieutenant Gephardt, and Officer Hallam
violated his Fourth Amendment rights by failing to intervene on
his behalf to stop the alleged use of excessive force by Monaco
and Flynn.


The Court of Appeals for the First Circuit, like several
others, has recognized that, "An officer who is present at the
scene and who fails to take reasonable steps to protect the
victim of another officer's use of excessive force can be held

28

liable under section 1983 for his nonfeasance." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 207 n.3 (1st Cir. 1990). See also O'Neill v. Krzeminski, 839 F.2d 9, 11–12 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers."). As it relates to excessive force, a viable claim for "failure to intervene" has four essential elements:

> (1) the defendant officer must have been present at the scene; and
>
> (2) he or she must have witnessed the use of force against the plaintiff and reasonably understood that the plaintiff's constitutional rights were being violated (i.e., that the level of force being employed was not objectively reasonable); and
>
> (3) the officer must have had a "realistic opportunity" to prevent the alleged use of excessive force; and, finally,
>
> (4) the officer must have had sufficient time to intervene and stop the alleged use of excessive force.

See, e.g., Davis v. Rennie, 264 F.3d 86, 102 (1st Cir. 2001) (citing O'Neill 839 F.2d at 11-2 and Gaudreault, 923 F.2d at 207 n.3). See also Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994); Norton v. Cross Border Initiative Task Force, No. 06-CV-490-PB, 2009 WL 1651238, at *6 (D.N.H. June 12, 2009). As for the second element listed above – knowledge that the victim's

constitutional rights were being violated - the Court of Appeals

for the Fourth Circuit has observed that:

> Although some of our sister Circuits have employed
> slightly different formulations of the knowledge
> prong, this requirement has substantively been the
> same: namely, that a bystanding officer must know of
> his fellow officer's misconduct.  The rationale
> underlying the bystander liability theory is that a
> bystanding officer, by choosing not to intervene,
> functionally participates in the unconstitutional act
> of his fellow officer.  If the bystander lacks such
> specific knowledge, he cannot be a participant in the
> unlawful acts, and the imposition of personal
> liability is impermissible.

Randall v. Prince George's Cty., Md., 302 F.3d 188, 204 n.24

(4th Cir. 2002).


A survey of relevant law discloses two other important

points.  First, in assessing whether a defendant police officer

reasonably understood that the plaintiff's constitutional rights

were being violated and in determining whether that officer had

"sufficient time" and a "realistic opportunity" to intervene,

courts must be careful when second-guessing decisions made by

police officers under circumstances that are tense, dangerous,

and rapidly evolving:

> In analogous cases alleging due process violations
> arising out of prison riots, the Supreme Court has
> contrasted circumstances like those involved in high-
> speed pursuits in which officers are forced to make
> split-second judgments, where the degree of fault must

> be extremely high before liability attaches, with
> those in which officers have sufficient opportunity to
> reflect on their course of action, as in cases
> involving inmate welfare, where the degree of fault
> required is correspondingly lower.  Applying this
> analysis to police pursuit cases, the Court noted,
> "like prison officials facing a riot, the police on an
> occasion calling for fast action have obligations that
> tend to tug against each other . . .  They are
> supposed to act decisively and to show restraint at
> the same moment, and their decisions have to be made
> in haste, under pressure, and frequently without the
> luxury of a second chance."  In the former type of
> case, the Court held that liability cannot be premised
> on "mid-level fault."
>
> This same general principle informs our analysis in
> failure to intervene cases.

Wilson, 294 F.3d at 14 n.29 (quoting County of Sacramento v.

Lewis, 523 U.S. 833, 852–853 (1998)) (emphasis supplied).  See

also Torres-Rivera v. O'Neill-Cancel, 406 F.3d 43, 52–53 (1st

Cir. 2005) ("[T]he adequate opportunity to intervene is related

to the concept that officers must, under some circumstances,

make judgments without any time for reflection.  That is the

Graham instruction that '[t]he calculus of reasonableness must

embody allowance for the fact that police officers are often

forced to make split-second judgments – in circumstances that

are tense, uncertain, and rapidly evolving – about the amount of

force that is necessary in a particular situation.'") (quoting

Graham, 490 U.S. at 396–97).

The second point is this: for an officer to be liable for failing to intervene to stop the use of excessive force by another officer, he or she must not only appreciate the wrongfulness of the level of force being used against the victim, but must also agree to or acquiesce in that wrongful conduct such that he or she becomes, in essence, a "tacit collaborator" in the unconstitutional assault.  That is to say, the decision not to intervene must be a conscious one.  See, e.g., Figueroa v. Mazza, 825 F.3d 89, 106 (2d Cir. 2016) ("A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it. Liability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality.") (citation omitted); Randall, 302 F.3d at 204 ("[A]n officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.") (footnote omitted).  See also Martinez, 54 F.3d at 985 n.4;  Krzeminski, 839 F.2d at 11-12; Norton, 2009 WL 1651238, at *6.

Viewed against the governing legal backdrop, it is plain that Simone's failure to intervene claims cannot survive summary judgment.

    A.   Sergeant Suttmeier.

The assault upon Simone by Trooper Monaco and Trooper Flynn occurred during two brief but discrete periods of time.  The first, which lasted about nine seconds, ended when Sergeant Suttmeier stepped forward and yelled "Easy! Easy!"  So, far from failing to intervene on Simone's behalf, Suttmeier did just the opposite.  And, his intervention had the desired effect: both Monaco and Flynn stopped punching Simone.  Consequently, Suttmeier did precisely what the law requires: from his perspective, he concluded (perhaps a bit prematurely) that Officers Hallam and Gaphardt had secured Simone and that the continued use of force was unnecessary.  Suttmeier acted, Flynn and Monaco responded, and Suttmeier turned away and started walking to his cruiser to report that Simone was in custody.

Viewed from Sergeant Suttmeier's perspective, in the brief but tense moments surrounding Simone's capture, Suttmeier had neither the time nor any realistic opportunity to do more than he did.  His conduct was appropriate and, therefore, objectively reasonable.  And, after he intervened and then turned away, he

33

had no reason to think that Flynn and Monaco would resume

hitting Simone or, if they did strike him again, that it would

be unnecessary, rather than in response to some threat or

resistance presented by Simone.[3]


B.    Officer Hallam and Lieutenant Gaphardt.

The same is true for Officer Hallam and Lieutenant

Gaphardt.  Both testified, without evidentiary contradiction,

that in those fleeting and chaotic moments, they believed that

Flynn and Monaco were acting in good faith and responding to

some threat posed by Simone.  That is to say, neither officer

immediately recognized (nor should they have recognized) that

excessive force was being employed and that Simone's

constitutional rights were being violated – an essential element

of Simone's failure to intervene claim.  Nor, given their focus

on securing Simone's hands, did they have "adequate time" or a

---

[3]    Even if Suttmeier had not turned away and, instead, was
fully conscious of the fact that Flynn and Monaco briefly began
striking Simone again, he could not be liable for failing to
intervene a second time.  First, that second round of blows
lasted only five seconds.  See, e.g., Gaudreault, 923 F.2d at
207 n.3 ("the attack came quickly and was over in a matter of
seconds.  A police officer cannot be held liable for failing to
intercede if he has no 'realistic opportunity' to prevent an
attack.").  Moreover, nothing in the record suggests that
Suttmeier knew or should have known that those additional blows
were excessive, rather than in response to a new or ongoing
threat posed by Simone.

"realistic opportunity" to: (1) turn their attention away from
Simone's hands and toward Flynn and Monaco; and (2) determine
that, given all the attendant circumstances, Simone no longer
posed a realistic threat and, therefore, Flynn and Monaco were
employing excessive force; and (3) then effectively intervene to
stop it.  The struggle to subdue Simone was ongoing and both
Hallam and Gaphardt testified that they were focused solely on
securing his hands and handcuffing him.

In situations like the one presented here, where the scene
is tense, chaotic, potentially dangerous, and rapidly evolving,
responding officers must be allowed to trust that other officers
are acting in a lawful and constitutional manner - <u>absent
evidence and an awareness to the contrary</u>.  Officer Hallam and
Lieutenant Gaphardt both testified that when they saw Flynn and
Monaco strike Simone, they assumed those officers were acting in
good faith and responding to some threat that Simone posed.
From their perspectives, and in the exceedingly brief period of
time during which these events transpired, neither officer had
any opportunity to confirm or discredit that reasonable (and
entirely permissible) assumption.  Only in calmer moments of
reflection and with the benefit of hindsight (and, of course,
the aerial view of the events offered by the news video) were

those officers able to reach the conclusion that Flynn and Monaco employed more force than necessary.

Given the evidence presented – particularly the video of the tumultuous, tense, and rapidly-moving events at issue, as well as the deposition testimony of record – Simone cannot, as a matter of law, establish that any of the three defendants breached a duty to intervene on his behalf. See generally Ontha v. Rutherford Cty., Tennessee, 222 F. App'x 498, 506 (6th Cir. 2007) ("We are unaware of any case law, nor have Plaintiffs cited any, that has recognized a duty of protection under such circumstances. To the contrary, the courts have been unwilling to impose a duty to intervene where, as here, an entire incident unfolds 'in a matter of seconds.' . . . Where we have recognized such a duty, in contrast, the underlying episode of excessive force has spanned a sufficient period of time for a nearby defendant to both perceive what was happening and intercede to stop it.") (quoting Gaudreault, 923 F.2d at 207 n.3).

VI.   Failure to Train.

Finally, in count seven of his amended complaint, Simone alleges that Nashua Police Commissioner James Tollner is liable, in his official capacity, for having failed to adequately train

Nashua police officers in "such basic police procedure as a
felony (high risk) stop."  Amended complaint at para. 179.


    A municipal employer may be liable when its failure to
properly train its officers "amounts to deliberate indifference
to the rights of persons with whom the police come into contact"
and where a specific deficiency in training is the "moving
force" behind a constitutional injury.  City of Canton v.
Harris, 489 U.S. 378, 388-389 (1989).  A supervisory official
may be liable for the conduct of his subordinates "where his
action or inaction is affirmatively linked to that behavior in
the sense that it could be characterized as supervisory
encouragement, condonation or acquiescence or gross negligence
amounting to deliberate indifference."  Wilson, 294 F.3d at 6-7
(citation and internal punctuation omitted).  Critically,
however, neither a municipality nor a supervisory official may
be held liable on such a theory unless the plaintiff first
establishes that he or she has suffered some constitutional
injury at the hands of a municipal employee.  See City of Los
Angeles v. Heller, 475 U.S. 796, 799 (1986).


    Here, because Simone cannot, as a matter of law, establish
that his constitutional rights were violated by either Officer
Hallam or Lieutenant Gaphardt of the Nashua Police Department,

Nashua Police Commissioner James Tollner cannot be liable to
Simone on a "failure to train" claim.  See, e.g., Wilson, 294
F.3d at 7 ("Without a finding of a constitutional violation on
the part of a municipal employee, there cannot be a finding of
section 1983 damages liability on the part of the
municipality.").


### Conclusion

The moments surrounding Simone's apprehension were loud,
chaotic, fast-moving, and potentially dangerous.  In all, the
critical events in question lasted about 19 or 20 seconds: the
initial nine seconds during which Monaco and Flynn punched
Simone; the roughly five second reprieve caused by Sergeant
Suttmeier's intervention; and the five second period during
which Monaco and Flynn again struck Simone.  Simone has failed
to point to sufficient evidence of record to plausibly allow a
properly instructed jury to conclude that, during that brief
period and under those circumstances, Sergeant Suttmeier,
Officer Hallam, and/or Lieutenant Gaphardt actually understood
(or should have understood) that Monaco and Flynn were using
excessive force.  Nor has Simone pointed to evidence suggesting
that any of those defendants had sufficient time and a
reasonable opportunity to intervene on Simone's behalf (beyond
Sergeant Suttmeier's laudable conduct in yelling "Easy! Easy!"

before he turned and left the scene to make his report to dispatch).  Nor, finally, has Simone pointed to evidence that might permit a jury to conclude that, despite being aware that Flynn and Monaco were using excessive force, one or more defendants consciously chose not to intervene to prevent what they knew (or should have known) was a violation of Simone's constitutional rights.  As a matter of law, then, Simone cannot prevail on his failure to intervene claims.

Simone's other state and federal claims against these defendants also fail as a matter of law.  Consequently, for the foregoing reasons, as well as those set forth in defendants' legal memoranda (documents no. 158-1, 161-1, 172, and 173), the motion for summary judgment filed by Nashua Defendants Lieutenant Gaphardt, Officer Hallam, and Commissioner Tollner (**document no. 158**) and the motion for summary judgment filed by Sergeant Suttmeier of the New Hampshire State Police (**document no. 161**) are granted.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

January 6, 2022

cc:  All Counsel of Record